**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

---

**QIHUI HUANG,**

    **Plaintiff,**

      **v.**

**TOM WHEELER, Chairman, Federal**
**Communications Commission,**

    **Defendant.**

**Civil Action No. 16-398 (JEB)**

---

<u>**MEMORANDUM OPINION**</u>

Some people have experienced the daily struggle of toiling under a supervisor who makes their blood boil. Plaintiff Qihui Huang – who worked as an electronics engineer at the Federal Communications Commission – asserts that she suffered a more literal form of this metaphorical malady. According to Huang, her supervisors at the FCC treated her so unfairly that the mere mention of their names caused her high blood pressure to rise to near-fatal heights. She thus brings this *pro se* action against her supervisors and the FCC, alleging that they created a hostile work environment, and discriminated and retaliated against her in violation of numerous federal and state laws. The FCC now files a Motion to Dismiss, contending that all of the claims in her Amended Complaint suffer from terminal defects. As the Court largely agrees with the agency's assessment, it will grant the Motion for the most part.

## I.    Background

The Court, as it must at this stage, draws the facts from Plaintiff's Complaints and her Opposition to the Motion to Dismiss. <u>See</u> <u>Brown v. Whole Foods Market Gr., Inc.</u>, 789 F.3d 146, 152 (D.C. Cir. 2015) (holding district court must consider all *pro se* litigant's allegations

1

when considering a motion to dismiss, including those found in plaintiff's opposition). It notes that Huang has not made this an easy task, however, because her pleadings contain only vague and cursory factual allegations. Where she does allege facts, for example, they mostly lack dates and critical details. The Court nevertheless attempts, as best it can, to describe the facts she has provided in the light most favorable to her.

Plaintiff is an Asian-American sexagenarian with two advanced degrees in electrical engineering and physics. See ECF No. 17 (Opposition) at 24. Her work has even contributed to a Nobel Prize in physics. Id. In 1991, she joined the FCC as a computer specialist. Id. at 19. During her long and successful career at the agency, she amassed several performance awards and was repeatedly promoted through competitive job postings. Id. Huang eventually reached the GS-15 level as a senior electronics engineer in the FCC's Office of Engineering Technology in 2004 and, over the next decade, continued to receive praise in that role from two different supervisors as she rose to a GS-15, Step 7 pay grade. Id. at 19-20; ECF No. 1 (Complaint) at 9.

Her smooth sailing at the agency ran into a squall, however, in 2014. In April of that year, her supervisor, Robert Weller, asked her to write a report on "wireless microphones systems in the U.S. market." Compl. at 2. Huang strove diligently on the task over the summer. Id. Weller left the agency in July 2014 without having commented on her work. See Opp. at 20-21. His replacement as Branch Chief, Martin Doczkat, requested the report shortly thereafter and gave it back to her several weeks later with 83 comments attached. Id. at 21-22. Huang was shocked by the extensive nature of these comments and an accompanying email indicating that, as a GS-15, she "should know" certain facts that she had not included in the report. Id. She subsequently demanded that Dozckat clarify both whether he believed that she was unqualified for her GS-15 position and whether she should take his comments to mean that she had

performed the task poorly.  Id.  Considering his subsequent silence an admission to both, Huang

simmered under what she believed was the unjustified nature of these critiques, given that she

had merely been following the instructions provided to her by Weller in crafting the report.  Id.

at 22-23.

Huang's health deteriorated under the weight of this criticism from her supervisor.  Id. at

27.  She became afraid of Dozckat and her Division Chief, Walter Johnson.  Id.  When either of

the men contacted (or suggested they might contact) her at work, her blood pressure would rise

to dangerously high levels, putting her in fear for her life.  Id.  Huang sought relief in two ways.

She first asked for help from a nurse at the FCC, who recommended that she request a supervisor

swap before her hypertension did her in.  Id.  Then, on October 20, 2014, Huang pursued

counseling at the agency's Equal Employment Opportunity office, claiming that Doczkat's

comments on her report were discriminatory and created a hostile working environment.  See

ECF No. 14 (Motion to Dismiss) at 3.

A month later, in November 2014, Doczkat gave Huang a failing grade on her midterm

performance review.  See Opp. at 26.  She immediately responded by calling for a meeting with

her union representative.  Id.  At that meeting, Doczkat represented that he had given her the

poor rating due to her failure, among other things, to complete required trainings that she now

claims she had in fact completed.  Id.  Frustrated, Huang quickly initiated EEO counseling in

regard to this review and also filed a formal EEO discrimination complaint on December 19,

2014, alleging that Dockzat's earlier negative comments on her report were motivated by

discriminatory animus and created a hostile working environment.  See Mot. at 3.

Huang's health continued its decline that winter, however, and, in early 2015, she was

forced to request medical leave to deal with her hypertension.  Id.  Before approving her request,

Doczkat asked that she provide additional medical verification of her condition.  Id.  This

demand, too, caused Huang's blood pressure to spike to dangerously high levels, and so she

warned him that she would file another complaint with the EEO office if he did not grant her

request.  See Opp. at 27.  She nevertheless provided the requested paperwork, and Dozckat

retroactively granted the medical leave as promised.  Id.; Compl. at 4 (noting she was out on sick

leave from early February 2015 through August 2015); Mot. at 22-23.  He also periodically

approved her requests for sick leave for the next six months.  See Mot. at 22-23.  In February

2015, however, he did not approve Huang's scheduled increase to a new pay step within the GS-

15 band.  See Opp. at 27.

Huang finally returned to work in August 2015.  Id.  At that time, she submitted a formal

request to the FCC's Office of Workplace Diversity for a transfer to another management team

as a reasonable accommodation for her high blood pressure.  See Opp. at 12.  She asserted that

she would die from her condition if the agency forced her to continue to interact with Johnson

and Dozckat.  See ECF No. 14, Exh. D (Letter from the Office of Workplace Diversity) at 1.

According to Huang, by this time, even the mention of their names caused her blood pressure to

spike to near-fatal levels.  Id.  She also attached two letters from her long-term doctor discussing

her history of severe hypertension, as well as similar statements from two nurses and an

acupuncturist.  Id. at 2-3.  The OWD denied the request, though, because she "refused to

participate in identifying modifications or adjustments that would be effective" at

accommodating her disability, such as allowing an intermediary to pass assigned work to her.  Id.

at 4-5; Am. Compl., ¶¶ 5, 8.

Around this time, the agency also placed Huang on a Performance Improvement Plan.

See Am. Compl., ¶ 9.  A PIP "precedes the proposal of a reduction in grade or removal for

unacceptable performance, and an employee has not less than thirty calendar days to demonstrate acceptable performance pursuant to her supervisor's identification of the core competency for which performance is unacceptable." Mot. at 23 n.13 (quotation marks omitted). In Huang's case, she was given 90 days to improve her performance or face termination. See Am. Compl., ¶ 9. Huang decided instead to retire in January 2016 at the age of 64. Id. at 9-10; Mot. at 2. Before doing so, however, she sought to complain to the OWD about several of the latter actions taken against her – e.g., the PIP and the initial denial of sick leave – but she received no response from that office and never filed a formal EEO complaint in regard to these grievances. See Opp. at 10-11 n.9.

Huang did, however, file, this federal lawsuit on February 29, 2016, against the FCC, Doczkat, and Johnson, alleging that they had discriminated against her on the basis of her age, sex, national origin, and disability. See ECF No. 1 (Complaint). After seeking leave for an extension of time to file a response, the FCC moved to dismiss that Complaint on June 6, 2016. See ECF No. 8. The Court denied that motion without prejudice when it granted Huang's subsequent motion for leave to "amend or correct her complaint by adding counts (claims)." See Am. Compl.; 6/30/2016 Minute Order. Now read together with her original Complaint, Huang's Amended Complaint asserts numerous counts of discrimination and/or retaliation against the FCC based on various federal and state laws, specifically: I) the FCC discriminated against her and created a hostile work environment when Doczkat intimated that she was unqualified for a GS-15 position and performed poorly on drafting her microphone report; II) Dozckat discriminated and retaliated against her when he gave her a "fail" on her November 2014 midterm performance evaluation; III) Dozckat discriminated and retaliated against her when he did not approve her sick leave; IV) Dozckat and Johnson discriminated and retaliated against her

when they denied her scheduled step increase; V) the FCC discriminated and retaliated against her when it placed her on the PIP; VI) the FCC discriminated against her when it did not approve her requests for a transfer as a reasonable accommodation for her hypertension; VII) the FCC committed various criminal acts through its discriminatory employment actions; VIII) the FCC forced her to resign as a result of its discrimination; and IX) the FCC, through all of the above actions, created a hostile working environment.  The FCC's Motion to Dismiss this Amended Complaint is now ripe.

## II.    Legal Standard

Federal Rule of Civil Procedure 12(b)(6) provides for the dismissal of an action where a complaint fails "to state a claim upon which relief can be granted."  In evaluating Defendant's Motion to Dismiss, the Court must "treat the complaint's factual allegations as true . . . and must grant plaintiff 'the benefit of all inferences that can be derived from the facts alleged.'"  Sparrow v. United Air Lines, Inc., 216 F.3d 1111, 1113 (D.C. Cir. 2000) (quoting Schuler v. United States, 617 F.2d 605, 608 (D.C. Cir. 1979)) (citation omitted); see also Jerome Stevens Pharms., Inc. v. FDA, 402 F.3d 1249, 1250 (D.C. Cir. 2005).  The pleading rules are "not meant to impose a great burden upon a plaintiff," Dura Pharm., Inc. v. Broudo, 544 U.S. 336, 347 (2005), and she must thus be given every favorable inference that may be drawn from the allegations of fact. Bell Atl. Corp. v. Twombly, 550 U.S. 544, 584 (2007).

Although "detailed factual allegations" are not necessary to withstand a Rule 12(b)(6) motion, id. at 555, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Twombly, 550 U.S. at 570).  The Court need not accept as true, then, "a legal conclusion couched as a factual allegation," nor an inference unsupported by the facts set forth in

the Complaint.  Trudeau v. Fed. Trade Comm'n, 456 F.3d 178, 193 (D.C. Cir. 2006) (quoting

Papasan v. Allain, 478 U.S. 265, 286 (1986) (internal quotation marks omitted)).  For a plaintiff

to survive a 12(b)(6) motion even if "recovery is very remote and unlikely," the facts alleged in

the complaint "must be enough to raise a right to relief above the speculative level."  Twombly,

550 U.S. at 555-56 (citing Scheuer v. Rhodes, 416 U.S. 232, 236 (1974)).  While *pro se*

pleadings are held to "less stringent standards than formal pleadings drafted by lawyers, [they]

must nonetheless plead factual matter that permits [the Court] to infer more than the mere

possibility of misconduct."  Brown, 789 F. 3d at 150 (internal quotations and citations omitted).

   The standard to survive a motion to dismiss under Rule 12(b)(1), though, is less

forgiving.  Under this Rule, Plaintiff bears the burden of proving that the Court has subject-

matter jurisdiction to hear her claims.  See Lujan v. Defenders of Wildlife, 504 U.S. 555, 561

(1992); U.S. Ecology, Inc. v. U.S. Dep't of Interior, 231 F.3d 20, 24 (D.C. Cir. 2000).  A court

also has an "affirmative obligation to ensure that it is acting within the scope of its jurisdictional

authority."  Grand Lodge of Fraternal Order of Police v. Ashcroft, 185 F. Supp. 2d 9, 13 (D.D.C.

2001).  For this reason, "'the [p]laintiff's factual allegations in the complaint . . . will bear closer

scrutiny in resolving a 12(b)(1) motion' than in resolving a 12(b)(6) motion for failure to state a

claim."  Id. at 13-14 (quoting 5A Charles A. Wright & Arthur R. Miller, Federal Practice and

Procedure § 1350 (2d ed. 1987) (alteration in original)).  Additionally, unlike with a motion to

dismiss under Rule 12(b)(6), the Court "may consider materials outside the pleadings in deciding

whether to grant a motion to dismiss for lack of jurisdiction."  Jerome Stevens, 402 F.3d at 1253;

see also Venetian Casino Resort, L.L.C. v. E.E.O.C., 409 F.3d 359, 366 (D.C. Cir. 2005) ("given

the present posture of this case – a dismissal under Rule 12(b)(1) on ripeness grounds – the court

may consider materials outside the pleadings").

### III.    Analysis

In considering Defendant's Motion to Dismiss, the Court first briefly discusses Plaintiff's claims that must be dismissed under Rule 12(b)(1) for threshold jurisdictional defects.  It then moves on to separately address what remains of Huang's suit under Rule 12(b)(6)'s more lenient *pro se* standard, taking each count in turn.  In this analysis, the Court treats Huang's initial Complaint, her Motion to Amend that Complaint, and all of the factual statements found in her Opposition to the Motion to Dismiss as covered under the umbrella of her Amended Complaint.

### A.  Jurisdictional Defects (Counts VI and VII)

The Court need not spill much ink over two of Huang's claims, as they suffer from basic jurisdictional defects.  First, to the extent that her Amended Complaint seeks to assert criminal charges in Paragraph 4 (Count VI), under either state or federal law, she lacks standing to bring these causes of action.  See Linda R.S. v. Richard D., 410 U.S. 614, 619 (1973) (holding "a private citizen lacks a judicially cognizable interest in the prosecution or nonprosecution of another").  Huang also may not pursue her federal employment-discrimination claims against Johnson and Dockzat as individuals.  See, e.g., Jarrell v. U.S. Postal Serv., 753 F.2d 1088, 1091 (D.C. Cir. 1985) ("[T]he head of the agency is the only proper party defendant in a Title VII action.").  The sole appropriate Defendant in this action is the Chairman of the FCC, Tom Wheeler, who is tasked with defending the agency under the relevant employment-discrimination laws.  See id.  The Court, accordingly, must dismiss all of Plaintiff's claims as asserted against Doczkat and Johnson.

The same fate befalls the claims found in Paragraphs 5 and 8 of her Motion to Amend (Count VII).  In these portions of the Amended Complaint, Huang alleges that the FCC discriminated against her under the Americans with Disabilities Act when it refused her

hypertension-based requests to transfer to a different chain of command.  See Am. Compl., ¶¶ 5,

8.  But the relevant provisions of the ADA do not apply to federal agencies like the FCC.  See

Calero-Cerezo v. U.S. Dep't of Justice, 355 F.3d 6, 11 n.1 (1st Cir. 2004) (explaining that "the

ADA is not available to federal employees").  Her disability-related claims instead arise under

the Rehabilitation Act.  Id.  As such, this Court has subject-matter jurisdiction over them only if

she first exhausted her administrative remedies with regard to the denial of this request for an

accommodation.  See Spinelli v. Goss, 446 F.3d 159, 162 (D.C. Cir. 2006) (explaining that

Rehabilitation "Act limits judicial review to employees 'aggrieved by the final disposition' of

their administrative 'complaint'") (citing 29 U.S.C § 794a(a)(1)); Mahoney v. Donovan, 824 F.

Supp. 2d 49, 58 (D.D.C. 2011) (failure to exhaust administrative remedies for Rehabilitation Act

claim is jurisdictional defect).

The FCC points out that Huang has not alleged that she exhausted such remedies, and she

readily admits that she failed to pursue any formal complaint with the EEOC or MSPB in regard

to her request for a transfer.  See Opp. at 10-11 n.9.  While she nevertheless asks this Court to

excuse her failure, the jurisdictional nature of this requirement prevents such an exception.  See

Spinelli, 446 F.3d at 162.  This disability-related count must therefore be dismissed as well.

B.  Report Comments (Count I)

In her first count, Huang alleges that Dozckat discriminated against her and created a

hostile working environment when he provided negative comments on her 2014 report.  See

Compl. at 2.  She is particularly unhappy about an email he sent, which insinuated that she was

not qualified for her job and that she had performed the task poorly.  Id. at 2-4; Opp. at 22.  In

essence, Huang argues that an inference can be drawn that the substantive comments on the

report were motivated by discriminatory animus because: 1) Doczkat failed to recognize the role

played by her former supervisor in crafting the report's content; 2) Doczkat was less qualified than she was to be a GS-15; and 3) previous supervisors gave her performance awards for over a decade before Dozckat criticized her work.  <u>See</u> Compl. at 2.  Huang finds further support for her claim in Dozckat's failure to assign someone else to work on the report while she was out on sick leave and in Weller's original decision to assign her the report since most of her work came directly from Congress or the FCC Chairman.  <u>Id.</u> at 3-4.  The latter allegation is somewhat confusing, of course, given that Huang does not otherwise allege that <u>Weller</u> discriminated against her in any way during his time at the agency.  She nevertheless seems to assert that these facts indicate that her supervisors concocted the report as a made-up assignment to find fault with her performance on the task.  <u>Id.</u> at 4.

This count, as the FCC correctly argues, fails to state either a viable discrimination or hostile-work-environment claim.  For the former, a plaintiff must allege that she suffered an adverse employment action because of her race, color, religion, sex, national origin, age, or disability.  <u>See</u> <u>Baloch v. Kempthorne</u>, 550 F.3d 1191, 1196 (D.C. Cir. 2008) (laying out basic elements of discrimination claim under Title VII, ADEA, and Rehabilitation Act).  The alleged employment action must be "tangible" as evidenced by "firing, failing to promote, a considerable change in benefits, or reassignment with significantly different responsibilities."  <u>Stewart v. Ashcroft</u>, 352 F.3d 422, 426 (D.C. Cir. 2003) (citations and quotation marks omitted).  Huang never alleges, however, that Dozckat's negative comments affected her employment in any such tangible way.  <u>Taylor v. Small</u>, 350 F.3d 1286, 1292-93 (D.C. Cir. 2003) ("[F]ormal criticism" is not actionable adverse action unless it "affect[s] the [employee's] grade or salary.").  At best, she complains only that she found the insinuation that she was unqualified for her job offensive and unfair.  But a "bruised ego will not suffice to make an employment action adverse."  <u>Stewart,</u>

352 F.3d at 426 (quoting <u>Stewart v. Ashcroft</u>, 211 F. Supp. 2d 166, 173 (D.D.C. 2002)).  Without

more, then, Huang has not stated a viable discrimination claim on the basis of Doczkat's

comments and conclusions alone.

   This count likewise falls well shy of establishing a hostile work environment.  The

Supreme Court has held that federal antidiscrimination laws make it unlawful for an employer to

"requir[e] people to work in a discriminatorily hostile or abusive environment."  <u>Harris v.

Forklift Sys., Inc.</u>, 510 U.S. 17, 21 (1993).  To prevail on such a claim, however, "a plaintiff

must show that his employer subjected him to 'discriminatory intimidation, ridicule, and insult'

that is 'sufficiently severe or pervasive to alter the conditions of the victim's employment and

create an abusive working environment.'"  <u>Baloch</u>, 550 F.3d at 1201 (quoting <u>Harris</u>, 510 U.S. at

21).  "The Supreme Court has made it clear that [such] 'conduct must be extreme to amount to a

change in the terms and conditions of employment.'"  <u>George v. Leavitt</u>, 407 F.3d 405, 416

(D.C. Cir. 2005) (quoting <u>Faragher v. City of Boca Raton</u>, 524 U.S. 775, 788 (1998)).  By

adhering to these standards, the Court "ensure[s] that Title VII does not become a general civility

code" requiring courts to police "the ordinary tribulations of the workplace."  <u>Faragher</u>, 524 U.S.

at 788 (citation and internal quotation marks omitted).

   It is plain that Huang alleges no more than the ordinary tribulations of the workplace in

this count.  She makes no attempt to characterize Doczkat's comments as objectively severe,

offensive, abusive, or even repeated, much less pervasive.  Huang does not contend, for example,

that the comments picked on (or even mentioned) her age, race, sex, disability, or national origin.

Nor does she argue that Doczkat repeatedly ridiculed or taunted her with these comments.  In

fact, her Amended Complaint states that Doczkat refused to further discuss his editing of the

report and, instead, remained silent when she asked him whether the comments indicated that she

was unqualified for her job.  See Compl. at 3-5.  On these facts, then, Huang has not sufficiently

pled a hostile-work-environment claim.  The Court must, accordingly, dismiss this count.

    C.  Midterm Performance Evaluation (Count II)

    In her next count, Huang alleges that Dozckat discriminated and retaliated against her

when he gave her a "fail" on her 2014 midterm performance evaluation.  See Compl. at 6.  To

support this claim, Huang states that she never received a failing grade in her previous decade in

that position or in the 23 years that she otherwise served at the agency.  Id.  It is understandable,

then, that this reversal of fortunes must have come as quite a blow.

    As explained above, however, to establish a viable claim for discrimination, Huang must

do more than point to the subjective impact that this evaluation had on her.  She must also plead

that the poor review had a tangible effect on the terms or conditions of her employment.

Stewart, 352 F.3d at 426.  Under this standard, "poor performance evaluations are" not

actionable adverse actions unless they "affect[] the [employee's] grade or salary."  Taylor, 350

F.3d at 1293; Russell v. Principi, 257 F.3d 815, 819 (D.C. Cir. 2001) (recognizing performance

evaluations are likely to be interlocutory or mediate decisions having no immediate effect upon

employment).  Huang makes no claim that this midterm evaluation had such an effect.  In fact,

she does not object to the FCC's description of this evaluation as merely a preliminary review.

As such, the Court has no grounds upon which to conclude that this evaluation tangibly affected

the terms or conditions of her employment, and she has thus not sufficiently stated a

discrimination claim.

    Huang similarly fails to plead a viable retaliation claim on this count.  To do so, she must

assert that she suffered a materially adverse action because she brought or threatened to bring a

discrimination claim.  See, e.g., 42 U.S.C. § 2000e-3(a).  While the "'adverse action' [element]

in the retaliation context encompass a broader sweep of actions than those in a pure

discrimination claim," Huang must nevertheless plead an adverse action that would have

"dissuaded a reasonable worker from making or supporting a charge of discrimination." Baloch,

550 F.3d at 1199 n.4.  A midterm performance evaluation that has no binding effect on an

employee's salary, bonus, leave, or other benefits does not qualify even under this more lenient

standard.  Id. at 1199 (noting "performance reviews typically constitute adverse actions only

when attached to financial harms" and holding review did not qualify as adverse action in

retaliation context even when accompanied by other letters of reprimand and counseling); accord

Weber v. Batista, 494 F.3d 179, 185 (D.C. Cir. 2007) (holding performance evaluation to be

materially adverse where it resulted in employee's not receiving a cash award).  As a result, the

Court will dismiss Huang's second count as well.

  D. Denial of Sick Leave Request (Count III)

  Count III alleges that Dozckat discriminated and retaliated against her when he failed to

immediately approve her request for sick leave in February 2015.  See Compl. at 8-9.  While

apparently conceding that he did eventually grant the request, she maintains that his demand for

further paperwork was unjustified because she supported her initial request with a doctor's notes.

See Opp. at 27; Compl. at 7.  Huang, moreover, contends that she suffered an attack of

hypertension as a result of this demand, which put her in serious jeopardy of death.  Id.  Doczkat,

according to her, only granted the leave because she threatened to file another discrimination

complaint with the OWD, and he realized then that he was in the wrong.  Id.

  This count, however, cannot survive for the same reason as the last two.  Sick leave that

is eventually granted – even after the imposition of restrictions such as a demand for additional

documentation – does not constitute the sort of adverse action necessary for a retaliation or

discrimination claim.  Baloch, 550 F.3d at 1198 (holding imposition of sick-leave restrictions requiring a physician to repeatedly certify the health problem and treatment plan did not amount to materially adverse action for retaliation claim where leave was eventually granted).  This count gains no traction.

E.  Denial of Step Increase (Count IV)

In her fourth count, Huang alleges that Doczkat, Johnson, and other unnamed FCC supervisors discriminated and retaliated against her when they denied her automatic step-increase in February 2015.  See Compl. at 9.  This resulted in her receiving a few thousand dollars less in her salary.  Id.  This fact means that, unlike her other claims just discussed, Huang has adequately supported this count by alleging a viable adverse employment action.

The FCC nevertheless argues that this count should be dismissed because Huang did not file an administrative complaint challenging this action before seeking relief in this Court.  It is axiomatic that federal employees may file a Title VII or ADEA action in federal court only after exhausting their administrative remedies.  Payne v. Salazar, 619 F.3d 56, 65 (D.C. Cir. 2010) (affirming dismissal of Title VII retaliation claim for failure to exhaust); 42 U.S.C. § 2000e-16(c) (Title VII exhaustion requirements); 29 U.S.C. § 633a(b)-(d) (ADEA exhaustion requirements).  These exhaustion requirements, however, are not jurisdictional.  Artis v. Bernanke, 630 F.3d 1031, 1034 n.4 (D.C. Cir. 2011) (citing Menominee Indian Tribe of Wis. v. United States, 614 F.3d 519, 527 (D.C. Cir. 2010)).  "Because untimely exhaustion of [Title VII] administrative remedies is an affirmative defense, the defendant bears the burden of pleading and proving it," rather than the plaintiff.  Bowden v. United States, 106 F.3d 433, 437 (D.C. Cir. 1997) (citation omitted and emphasis added).  As a result, unless the Court transforms the Motion into one for summary judgment, it is typically difficult for defendants to prevail at this

stage.  In this case, however, Huang concedes that she did not file an administrative complaint with regard to this adverse action, see Opp. at 10-11, so the Court need not resort to such a conversion to dismiss the claim here.

Huang nevertheless protests that the exhaustion requirement should be excused because she complained to the OWD about other adverse actions and attempted to complain about this action, too, but received no response to her emails.  Id. at 11-13.  She further alleges that the acting director of the OWD treated her unfairly, and, as a result, she could not respond to OWD emails or communications without risking death due to her high blood pressure.  Id.  Finally, she argues that she did not need to exhaust her administrative remedies here because exhaustion is not required for claims brought under Section 1981 or Section 1983.  Id. at 13-14 (citing 42 U.S.C. §§ 1981, 1983).

Most of Huang's arguments are insufficient as a matter of law to excuse her admitted failure to exhaust this claim.  Taking the last one first, Section 1983 does not apply to federal officials acting under the color of federal law.  Settles v. U.S. Parole Com'n, 429 F.3d 1098, 1104 (D.C. Cir. 2005).  Section 1981 likewise provides a federal remedy against discrimination in private employment, Johnson v. Ry. Exp. Agency, Inc., 421 U.S. 454, 459-60 (1975) (emphasis added), and, consequently, also does not apply to a federal agency like the FCC.  To the extent that Huang means through her Opposition to re-plead this count under those provisions, then, the Court must dismiss the count under Rule 12(b)(1) for want of jurisdiction. Settles, 429 F.3d at 1105 (explaining assertion of Section 1983 claim against federal entity presents jurisdictional defect going to sovereign immunity of United States).

The Court similarly rejects Plaintiff's assertion that her failure might be excused on the basis of her two previous EEO complaints that were made in regard to Doczkat's comments on

her report and the low performance evaluation.  An employee must exhaust the administrative

process for each discrete action for which she seeks to bring a claim.  National R.R. Passenger

Corp. v. Morgan, 536 U.S. 101, 113, 122 (2002); Coleman-Adebayo v. Leavitt, 326 F. Supp. 2d

132, 137 (D.D.C. 2004); Martinez v. Potter, 347 F.3d 1208, 1211 (10th Cir. 2003).  The Supreme

Court in Morgan noted that "each incident of discrimination and each retaliatory adverse

employment decision constitutes a separate actionable 'unlawful employment practice.'"  536

U.S. at 114.  As the court in Coleman-Adebayo further elaborated:

> The key to determining whether a claim must meet the procedural
> hurdles of the exhaustion requirement itself, or whether it can piggy-
> back on another claim that has satisfied those requirements, is
> whether the claim is of a "discrete" act of discrimination or
> retaliation or, instead, of a hostile work environment. "Discrete acts
> such as termination, failure to promote, denial of transfer, or refusal
> to hire" are individual acts that "occur" at a fixed time. Accordingly,
> plaintiffs alleging such discriminatory action must exhaust the
> administrative process regardless of any relationship that may exist
> between those discrete claims and any others.

326 F. Supp. 2d at 137-38 (quoting Morgan, 536 U.S. at 114).  As a matter of law, Huang's

allegation that she filed other EEO complaints does not state a potential avenue to relief from the

exhaustion requirement on this count.

The same cannot be said, however, of Huang's factual recitations that appear to go to

whether the FCC's OWD office prevented her from filing a complaint or misled her as to what

would be required to pursue her claim in district court.  See Opp. at 10-11 n.9.  Because the

"filing of a timely charge of discrimination with the EEOC is not a jurisdictional prerequisite to

suit in federal court, . . . [it] is subject to waiver, estoppel, and equitable tolling."  Zipes v. Trans

World Airlines, Inc., 455 U.S. 385, 393 (1982).  At least one Circuit has held that an "equitable

exception to the exhaustion requirement is available when an EEOC representative misleads the

plaintiff concerning his claim."  Josephs v. Pac. Bell, 443 F.3d 1050, 1061 (9th Cir. 2005).  This

relief may be granted to a plaintiff who: "(1) diligently pursued [her] claim; (2) was misinformed

or misled by the administrative agency responsible for processing [her] charge; (3) relied in fact

on the misinformation or misrepresentations of that agency, causing [her] to fail to exhaust [her]

administrative remedies; and (4) was acting pro se at the time." Id. (quoting Rodriguez v.

Airborne Express, 265 F.3d 890, 902 (9th Cir. 2001)).  Whether or not Huang can ultimately

meet such a standard is more appropriately resolved at summary judgment.  For now, under the

generous *pro se* pleading standard, she has alleged sufficient facts to create a plausible right to

such relief, and this count thus survives.

    F.  Placement on Performance Improvement Plan (Count V)

      Huang makes only passing reference to her placement on a PIP prior to her retirement

from the agency as another potential basis for this suit.  See Am. Compl., ¶ 9. She does not

indicate when this occurred, nor who made the decision to place her on the PIP.  Regardless, this

fact alone does not meet the standard required for an actionable adverse action unless it results in

a change in pay or grade.  Taylor, 350 F.3d at 1293, 1296 (holding placement on PIP did not

constitute adverse employment action as required to establish discrimination or retaliation claim,

absent evidence such conduct caused change in grade or salary); Chowdhury v. Bair, 604 F.

Supp. 2d 90, 96 (D.D.C. 2009).  Huang, again, does not allege that the PIP resulted in such a

change.  The Court, accordingly, dismisses this claim.

    G.  Constructive Discharge (Count VIII)

      Huang also alleges that the above actions forced her to retire from the agency in January

2016, several years before she intended to do so.  See Compl. at 10-11; Am. Compl., ¶ 10.  In

essence, this is a constructive-discharge claim.  The constructive-discharge doctrine considers

"an employee's reasonable decision to resign because of unendurable working conditions . . . to

[be] a formal discharge for remedial purposes."  <u>Penn. State Police v. Suders</u>, 542 U.S. 129, 141 (2004).  Constructive-discharge claims are therefore designed to address situations in which employers coerce employees to resign by creating intolerable working conditions.  <u>Id.</u>

      To support such a claim in the discrimination context, Huang must allege "that [she] was discriminated against by [the FCC] to the point where a reasonable person in [her] position would have felt compelled to resign."  <u>Green v. Brennan</u>, 136 S. Ct. 1769, 1777 (2016) (describing elements for constructive-discharge claim under Title VII).  These conditions must go beyond "ordinary" discrimination.  <u>Perry v. Harris Chernin, Inc.</u>, 126 F.3d 1010, 1015 (7th Cir. 1997).  The conduct, in fact, must amount to more than that required to support a hostile-work-environment claim so that the plaintiff's resignation qualifies as a fitting response to the discrimination.  <u>Steele v. Schafer</u>, 535 F.3d 689, 694-95 (D.C. Cir. 2008).  In other words, in a run-of-the-mill hostile work environment, an employee is expected to "mitigate damages by remaining on the job unless that job presents such an aggravated situation that a reasonable employee would be forced to resign."  <u>Clark v. Marsh</u>, 665 F.2d 1168, 1173 (D.C. Cir. 1981) (quotation marks omitted).  An employee's decision to retire is thus insufficient where driven only by concern for the effect of the job's normal tasks on her health.  <u>See, e.g.</u>, <u>Spence v. Maryland Cas. Co.</u>, 995 F.2d 1147, 1156 (2d Cir. 1993) ("[T]he fact that an employee develops stress-related ill health from the demands of his voluntarily undertaken position or from criticisms of his performance, and as a result determines that health considerations mandate his resignation, does not normally amount to a constructive discharge by the employer.").  Likewise, a failure to promote, a change in job duties, a transfer, criticism, pressure from a supervisor, or being ignored by co-workers are not the sort of "aggravating factors" necessary to support a constructive-discharge claim.  <u>Veitch v. England</u>, 471 F.3d 124, 131 (D.C. Cir. 2006).

Suffice it to say, the allegations in Huang's Amended Complaint fall far short of this standard.  Even considering every factual allegation she provides as part and parcel of this claim, she has only asserted stress from working for a critical or difficult supervisor.  At no point does she point to an aggravating factor sufficient to support a reasonable employee's decision to involuntarily retire.  She never alleges any derogatory comments made about any of her protected characteristics.  Nor does she describe any contact from her supervisors that could be considered as outside the ordinary contact expected from a superior.  Huang, consequently, has not stated a viable constructive-discharge claim.

H. Hostile Work Environment (Count IX)

Although Plaintiff does not explicitly enumerate a hostile-work-environment count based on the combination of the above-mentioned actions taken against her by Johnson and Dozckat, her *pro se* pleading may fairly be construed to allege such a claim.  In particular, she repeatedly asserts that her supervisors created a hostile work environment by, *inter alia*, "deliver[ing] documents to her, talk[ing] to her, communicat[ing] with her, email[ing] her, call[ing] her, knock[ing] her office door, forcibly open[ing] her office door, and etc., more," when they knew that "their . . . actions frequently or always caused Plaintiff's blood pressure [to] promptly raise[] . . . up to 223 mmHg."  Compl. at 6-7; Am. Compl. at 2-3.  She thus contends that they knowingly and willfully placed her at substantial risk of death through these actions.  Id. Because the hostile-work-environment standard is somewhat lower than that required for constructive discharge, out of an abundance of caution, the Court addresses this claim separately. Yet, even considering in concert all of the factual allegations made throughout the Amended Complaint, the Court still finds the count wanting.

As indicated above, to establish a hostile work environment, Huang must allege "harassing behavior sufficiently severe or pervasive to alter the conditions of [her] employment." Suders, 542 U.S. at 133 (quotation marks omitted).  The "discriminatory intimidation, ridicule, and insult," moreover, must be "sufficiently severe or pervasive [so as] to alter the conditions of the victim's employment and create an abusive working environment.'" Baloch, 550 F.3d at 1201; George, 407 F.3d at 416 (holding conduct must be extreme).

Looking at "all the circumstances" here – including "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance" – Dozckat and Johnson's conduct cannot fairly be said to state a plausible ground for relief. Morgan, 536 U.S. at 116 (quoting Harris, 510 U.S. at 23).  Huang has instead alleged only the ordinary contact required for a supervisor to oversee his employee.  She does not point to any inappropriate or abnormal conduct inflicted upon her by either Johnson or Doczkat.  She offers no allegation, for example, that her supervisors sought to increase their contact with her to induce or aggravate her hypertension.  At most, Doczkat and Johnson may have given her unjustified criticism on her work product and unfairly denied her a scheduled increase in pay. This is not the sort of conduct that is necessary to support a hostile-work-environment claim.

**IV.     Conclusion**

For the reasons stated above, the Court will dismiss all of Plaintiff's claims against Johnson and Doczkat.  It will also dismiss all of her claims against the FCC with the sole exception being that regarding the denial of her within-grade step increase in February 2015.  A contemporaneous Order will issue to this effect.

/s/ *James E. Boasberg*
JAMES E. BOASBERG
United States District Judge

Date:  October 19, 2016