UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| QIHUI HUANG,<br><br>Plaintiff,<br><br>v.<br><br>AJIT PAI, Chairman,<br>Federal Communications Commission,<br><br>Defendant. | Civil Action No. 16-398 (JEB) |

**MEMORANDUM OPINION**

Plaintiff Qihui Huang is an "Asian American, foreign-born" woman over sixty years old. See ECF No. 1 (Complaint) at 1, 5. After an almost 25-year career at Defendant Federal Communications Commission, Huang brought this *pro se* suit, alleging a host of discriminatory and retaliatory actions by her supervisors. Defendant previously filed a Motion to Dismiss, which the Court granted except as to one claim: the Agency's allegedly improper denial of Huang's within-grade pay increase. See Huang v. Wheeler, 215 F. Supp. 3d 100, 114 (D.D.C. 2016). The parties have now filed Cross-Motions for Summary Judgment on this remaining issue. Because the Court finds that Huang did not exhaust her administrative remedies — and would lose on the merits even if she had — it will grant Defendant's Motion.

**I.    Background**

As the prior Opinion thoroughly detailed the factual history of Plaintiff's tenure at the FCC, id. at 103-106, the Court here sets forth the facts (in the light most favorable to Huang) only as they relate to her pay-increase denial.

1

A.  Factual History

Huang began at the FCC in 1991 as a GS-12 computer specialist.  See Def. Opp., Exh. 1 (Response to Pl. Statement of Facts), ¶ 13.  In 2004, after several promotions, she became a GS-15 senior electronics engineer in the Technical Analysis Branch of the Office of Engineering and Technology.  See Def. MSJ, Exh. 2 (SOF), ¶ 2.  GS-15 engineers are "considered senior expert consultants and subject matter experts in one or more areas of engineering or communications." ECF No. 82 (Report of Investigation) at 203.  They "conduct[] the most difficult types of technical studies and/or direct[] special project teams on matters pertaining to various phases of electromagnetic wave propagation."  Id. at 215.  Senior engineers, accordingly, must "exercise[] a high degree of originality, initiative and sound judgment."  Id.

Huang's first ten years as a GS-15 seem to have been smooth sailing; she received "pass" performance-review ratings every year and even performance awards in several years.  See Def. Response to Pl. SOF, ¶¶ 30-34.  Robert Weller, TAB Chief, was Huang's supervisor during much of this time.  On April 21, 2014, he assigned her a wireless-microphone-study report, which would cause her great difficulty.  The assignment tasked Huang with "identify[ing] current wireless microphone operating parameters and analyz[ing] several spectrum options for possible use by wireless microphones."  Pl. MSJ, Exh. E at 2 (Apr. 1, 2014, Mem. from Weller to Huang).  Weller outlined nine specific areas that she was to research and analyze and requested that she "provide a type-written report with appropriate tables and charts . . . by May 1, 2014."  Id.  Plaintiff did not submit a first draft until July, which Weller reviewed page by page, providing a list of areas that needed clarification or improvement.  He noted multiple "formatting[,] . . . spelling and grammar errors," and he also had concerns regarding Huang's analysis.  Id. at 6.  At some point, she submitted another draft, which Weller noted was "an

improvement." Id. at 4. He observed, however, that several areas still needed additional shoring up, including incorrect calculations and "gaps and inconsistencies in the data." Id. at 5. Huang had not completed the report by the time Weller left the Agency in late July 2014.

When Weller departed, it appears he took the wind in Huang's sails with him. Martin Doczkat, also a GS-15 senior engineer, became the new TAB Chief, and Huang sent him what she deemed the final version of the report on August 26, 2014. See ROI at 236. Like Weller, Doczkat was not satisfied with the report, but he was more direct in his criticism. On September 11, 2014, he returned the 31-page draft report to Huang with 83 comments. Id. at 40-70. In addition to critiquing the "numerous typos, some quantitative errors, lack of citations[, and] copyright issues," id. at 179, Doczkat noted that the report was incomplete "in that it seems to overlook many of the tasks initially assigned by" Weller. Id. at 235. He further noted that, "[a]s a GS-15 electronics engineer," Huang was "expected to . . . conduct difficult and highly complex technical analyses" as well as "conduct original studies." Id. The draft report, by contrast, used simple models that appeared to have been copied from Wikipedia and heavily relied on other data sources without adjusting them to fit the task. The original May 1, 2014, deadline had "far since passed," but Doczkat encouraged Huang to "keep at it, as there may be other opportunities in the future if th[e] paper can be sufficiently improved." Id. He suggested an extended deadline one month in the future for Huang to complete her revisions and submit a final report and offered to meet with her "separately on a weekly basis if that may be helpful to work to a more complete and original quality work product." Id.

The two emailed back and forth about the project through the end of September with reasonable civility. Shortly thereafter, however, the ship ran aground. Doczkat emailed Huang on October 2, 2014, in an attempt to schedule a meeting to discuss her progress, to which she

3

replied that she preferred to communicate through email rather than meet face to face. Id. at 262-63. Huang then responded to each of Doczkat's 83 comments and asked that he respond to her notes. Without that feedback, she told him, she was unable to work on the study. Id. at 284, 287. Although Doczkat again reiterated his offer to discuss the project with her in advance of the fast-approaching deadline, id. at 283, communication between the two ceased, and Huang never submitted another draft of the report. See Pl. Opp., Exh. 1 (Opp. to Def. SOF), ¶ 26.

On November 20, Huang had a midterm-progress-review meeting with Doczkat's boss, Walter Johnston. (Johnston would not normally conduct these reviews, but Huang refused to meet with Doczkat in person.) In written follow-up comments provided to her after the meeting, Johnston "reminded [her] that as a GS-15 engineer [she is] expected to work with minimal supervision on complex engineering matters," and her submitted work product should be acceptable "with minimum modifications." ROI at 222. In addition to the never-completed wireless-microphone-study report, Johnston also evaluated her refusal to work on an additional assignment involving a TV study. Id. at 162. Based on those two reports — Plaintiff's only assignments during the review period — Johnston concluded that her "work was not accomplished in an effective or efficient manner." Id. at 226. He warned Huang that her work over the last 90 days did "not me[e]t our expectations for work performance at [her] grade level" and gave her 90 days to improve. Id. at 228. It was critical for Plaintiff to meet her performance expectations during this period because she would be eligible on February 26, 2015, for a within-grade step increase from GS-15, Step 7 to GS-15, Step 8 only if her performance was "at an acceptable level of competence." Def. MSJ, Exh. E (Basic Negotiated Agreement) at 58. In other words, she needed to receive a "pass" level on her performance-rating form. On December 5, 2014, Doczkat sent Huang a notice that it was possible she would not receive a pass rating.

4

The notice outlined the areas in which he felt she was deficient and concluded that at that time her "overall performance [wa]s not at the Pass level." Id. at 8. On January 29, 2015, Plaintiff received a "fail" rating for that period. See ROI at 221. As such, she did not receive her within-grade pay increase when she became eligible in February.

B. Procedural History

Based on Doczkat's September 11, 2014, comments on the report, Plaintiff made an informal Equal Employment Opportunity complaint on October 23, 2014, alleging that her supervisors had "intentionally discriminated against [her] based on [her] race, sex, national origin, age, and/or color" by describing her work as not representative of a GS-15. See ROI at 28. The FCC EEO counselor provided Huang with a notice of right to file a discrimination complaint on December 18, 2014, and she filed her formal complaint the next day. Id. at 3. On February 4, 2015, Plaintiff filed a second complaint, alleging that the Agency had retaliated by denying her sick leave and giving her a fail rating.

On March 30, 2015, Huang emailed the FCC's Office of Workplace Diversity manager Linda Miller to file a new complaint. See Def. MSJ, Exh. H at 28. In this third complaint, she asked to add a claim that she did not receive her step-up increase in February because of discrimination and/or retaliation. Miller did not reply to the email. At the beginning of September 2015, however, Plaintiff and Katherine Bankhead, the EEO investigator assigned to her case, communicated about the first two complaints via email. Huang tried again to add her pay-increase denial and other claims, but Bankhead told her that she needed to contact Miller to amend her complaint. See ROI at 349. Huang then replied that she did not want to amend her complaint, to which Bankhead confirmed that "the additional issues [she] raised will not be investigated," including her within-grade-increase denial. See ROI at 347. As such, the EEO

5

investigated three issues relating to the alleged discrimination against Plaintiff: (1) Doczkat's comments that her work product did not meet the standards of a GS-15 engineer; (2) the January 29, 2015, fail rating; and (3) the denial of her sick-leave request. The EEOC completed the ROI, and Huang accepted the record on December 1, 2015. See ECF No. 84 (Final Agency Decision) at 2.

In lieu of amending her complaint to include the step-up pay-increase claim in her ongoing EEO complaint, Huang filed a grievance through her Union's negotiated grievance process. On September 17, 2015, she requested that the Agency rescind her fail rating and award her a GS-15, Step 8 salary. See Def. MSJ, Exh. F (Step 1 Grievance Decision). The grievance was denied on October 19, 2015, and Huang did not administratively appeal. Id. at 6.

Plaintiff next filed this civil action on February 26, 2016, alleging discrimination, retaliation, and a hostile work environment by the FCC, Doczkat, and Johnston. The Agency, consequently, dismissed her EEO complaint. Id. at 8; 29 C.F.R. § 1614.107(a)(3) (An "agency shall dismiss an entire complaint . . . [t]hat is the basis of a pending civil action in a United States District Court in which the complainant is a party."). Construing her Complaint and Amended Complaint liberally, the Court divined nine claims of discrimination and/or retaliation, including a count alleging a hostile work environment. The Court first dismissed Doczkat and Johnson as improper Defendants and then, in a lengthy Opinion, dismissed all of her counts against the FCC except the within-grade-increase denial. Huang, 215 F. Supp. 3d at 114. Although Plaintiff conceded that she had not exhausted this claim before bringing her suit, the Court found that the count survived a motion to dismiss because she had alleged sufficient facts showing that her failure to exhaust could be excused under equitable doctrines. Id. at 112. More specifically, Huang alleged that Miller's lack of response to the March 30 email thwarted her attempt to add

6

the pay-increase claim. Id. at 111. The parties then conducted discovery and have now brought Cross-Motions for Summary Judgment on that one count.

## II.     Legal Standard

Summary judgment may be granted if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); see also Anderson v. Liberty Lobby, 477 U.S. 242, 247-48 (1986); Holcomb v. Powell, 433 F.3d 889, 895 (D.C. Cir. 2006). A fact is "material" if it is capable of affecting the substantive outcome of the litigation. See Liberty Lobby, 477 U.S. at 248; Holcomb, 433 F.3d at 895. A dispute is "genuine" if the evidence is such that a reasonable jury could return a verdict for the non-moving party. See Scott v. Harris, 550 U.S. 372, 380 (2007); Holcomb, 433 F.3d at 895. "A party asserting that a fact cannot be or is genuinely disputed must support the assertion" by "citing to particular parts of materials in the record" or "showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1).

When a motion for summary judgment is under consideration, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." Liberty Lobby, 477 U.S. at 255; see also Mastro v. PEPCO, 447 F.3d 843, 850 (D.C. Cir. 2006); Aka v. Wash. Hosp. Ctr., 156 F.3d 1284, 1288 (D.C. Cir. 1998) (*en banc*). On a motion for summary judgment, the Court must "eschew making credibility determinations or weighing the evidence." Czekalski v. Peters, 475 F.3d 360, 363 (D.C. Cir. 2007).

The non-moving party's opposition, however, must consist of more than mere unsupported allegations or denials, and must be supported by affidavits, declarations, or other competent evidence, setting forth specific facts showing that there is a genuine issue for trial.

7

See Fed. R. Civ. P. 56(e); Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986). The non-movant, in other words, is required to provide evidence that would permit a reasonable jury to find in her favor. See Laningham v. U.S. Navy, 813 F.2d 1236, 1241 (D.C. Cir. 1987).

## III. Analysis

The Agency's denial of Huang's within-grade step increase to GS-15, Step 8 is the sole count still afloat. Title VII makes it unlawful for an employer to "discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin," 42 U.S.C. § 2000e-2(a), or "because he has made a charge . . . or participated in any manner in an investigation" of employment discrimination. See 42 U.S.C. § 2000e-3(a). The Age Discrimination in Employment Act adds age discrimination to the mix. See 29 U.S.C. § 623. Plaintiff contends that Defendant discriminated against her based on her age, sex, race, and national origin and retaliated against her in response to her EEO complaints. According to Huang, because of this discrimination and retaliation, she received a fail rating, which, in turn, was the cause of her pay-increase denial. Defendant retorts that this claim has not been administratively exhausted and is nonetheless meritless because the Agency had a legitimate, non-discriminatory reason for denying the increase. Even taking all of the facts in the light most favorable to Huang, the Court agrees with Defendant on both scores.

### A. Exhaustion

"Before filing suit, a federal employee who believes that her agency has discriminated against her in violation of Title VII must first seek administrative adjudication of her claim." Payne v. Salazar, 619 F.3d 56, 58 (D.C. Cir. 2010) (citing Scott v. Johanns, 409 F.3d 466, 468 (D.C. Cir. 2005)). An FCC employee alleging discrimination can file a complaint either through

8

the Union's negotiated grievance procedure or through the EEOC, "but not both." Basic Negotiated Agreement at 115. Whichever process the employee timely initiates first is deemed to be her elected procedure. Id. The record is a bit murky as to which process Huang chose, but, as explained below, under either route her pay-increase claim is not exhausted.

       1. *EEO Complaint*

Title VII "'specifies with precision' the prerequisites that a plaintiff must satisfy before filing suit." National R.R. Passenger Corp. v. Morgan, 536 U.S. 101, 109 (2002) (quoting Alexander v. Gardner-Denver Co., 415 U.S. 36, 47 (1974)). When an employee believes that her employer has violated Title VII, she must first contact the agency's EEO counselor to initiate an informal complaint. If the counselor's attempts at resolution are unfruitful, the employee can lodge a formal complaint, which must be filed within 180 days from the date on which the alleged discriminatory act occurred. See 42 U.S.C. § 2000e-5(e)(1). "Each discrete discriminatory act starts a new clock for filing charges alleging that act." Morgan, 536 U.S. at 113. The agency then investigates the claim, after which the employee can request an administrative hearing or a summary decision. See 29 C.F.R. § 1614.108(f). Either route ultimately culminates in a final order, at which point the claim is exhausted. If the employee is not satisfied with the agency's final decision, she can file a federal lawsuit. Properly exhausted claims encompass those that the complaint and its accompanying documents detail with "'sufficient information' to put the agency on notice of the claim and to 'enable the agency to investigate' it." Crawford v. Duke, No. 16-5063, 2017 WL 3443033, at *4 (D.C. Cir. Aug. 11, 2017) (quoting Artis v. Bernanke, 630 F.3d 1031, 1034 (D.C. Cir. 2011)).

Each part of the administrative process is governed by statutory filing deadlines. These time periods are "subject to equitable doctrines such as tolling or estoppel," which are to be

9

"applied sparingly." Morgan, 536 U.S. at 113; see Josephs v. Pac. Bell, 443 F.3d 1050, 1061 (9th Cir. 2006) (excusing exhaustion when EEOC representative misled plaintiff regarding his claim); Currier v. Radio Free Europe/Radio Liberty, Inc., 159 F.3d 1363, 1368 (D.C. Cir. 1998) (applying equitable estoppel when employer affirmatively misled employee to believe that grievance would be resolved in employee's favor); Broom v. Caldera, 129 F. Supp. 2d 25, 26-28 (D.D.C. 2001) (excusing non-exhaustion where administrative law judge misinformed complainant about proper procedures); Koch v. Donaldson, 260 F. Supp. 2d 86, 90-91 (D.D.C. 2003) (equitably tolling filing period given EEO office's fax-machine malfunction). Defendants have the burden to prove a failure to exhaust, but a plaintiff who concedes that she has not exhausted her claim has the burden to show "facts supporting equitable avoidance of the defense." Bowden v. United States, 106 F.3d 433, 437 (D.C. Cir. 1997).

Huang filed two timely EEO complaints relating to 1) Doczkat's feedback on her wireless-microphone-study report and 2) her January 2015 fail rating. (The second complaint also included a claim of retaliation for denial of sick leave, but the EEOC dismissed that claim because Huang's leave was ultimately approved.) She did not, however, file a complaint regarding her pay-increase denial. Although she admits this omission, Plaintiff argues that the Court should nonetheless allow this claim to go forward because the Agency's EEO manager, Linda Miller, never responded to Huang's March 30, 2015, email attempting to add it to the ongoing EEO investigation. At the motion-to-dismiss stage, the count survived because it was unclear whether (or to what extent) "the FCC's [Office of Workplace Diversity] prevented her from filing a complaint or misled her as to what would be required to pursue her claim in district court." Huang, 215 F. Supp. 3d at 112. Now, with the benefit of discovery and a more robust record, the Court finds no equitable considerations that excuse non-exhaustion.

10

Although Miller did not responded to Huang's email, Plaintiff's conversations with the EEO investigator, Bankhead, show that she affirmatively decided not to amend her EEO complaint to add the step-increase denial. When Bankhead told Plaintiff that she could not "add additional issues" through her affidavit and would need to contact Miller to amend her complaint, see ROI at 349, Huang replied that she did not want to "amend [her] complaint at this moment." Id. at 347. Bankhead then confirmed that "the additional issues [Huang] raised will not be investigated in this complaint," including the pay-increase denial. Id. Huang does not address this exchange with Bankhead or argue why, in light of it, any equitable considerations apply here.

Given such an unequivocal decision not to amend, Huang cannot somehow maintain that her within-grade-increase claim was "reasonably related to" exhausted claims in her formal EEO complaint and should be considered. See Poole v. Gov't Printing Office, No. 16-494, 2017 WL 2912401, at *5-6 (D.D.C. July 7, 2017) (noting that this Circuit has not decided whether the "reasonably related" doctrine for claims that happened after the initiation of an EEO complaint survives Morgan). Huang's email to Bankhead meant that the Agency was put on notice that her within-grade-increase denial was not at issue, and it would go against the purpose of the exhaustion requirement to allow her to belatedly add it now. See Loe v. Heckler, 768 F.2d 409, 417 (D.C. Cir. 1985) (exhaustion requirements "ensure[] that the agency ha[s] notice of [the complainant's] grievance, and a fair opportunity to provide full redress or to attempt an informal accommodation"); Final Agency Decision at 2 n.4 (noting that denial of step increase "[wa]s not before the Agency as Complainant did not raise it in either of her complaints and it was not raised within 45 days of the alleged incident"); compare Coleman v. Duke, No. 15-5258, 2017 WL 3480705, at *7-8 (D.C. Cir. Aug. 15, 2017) (holding that plaintiff exhausted retaliation

11

claim that was included in formal complaint but not EEOC's acceptance letter), with Hamilton v. Geithner, 666 F.3d 1344, 1350 (D.C. Cir. 2012) (finding that claim that was presented to EEO counselor but never included in formal EEO complaint was not exhausted). A plaintiff who voluntarily abandons a claim during the administrative process cannot revive it in federal court. See Katz v. Winter, No. 07-3481, 2008 WL 5237252, at *1 (3rd Cir. 2008); Harris v. United States, 919 F. Supp. 343, 346 (S.D. Cal. 1996). The Court thus finds that equitable considerations do not excuse Plaintiff's failure to exhaust.

      2. *Negotiated Grievance Process*

Evaluating Huang's claim under the negotiated grievance process leads to the same result. If the employee chooses this alternative, it proceeds in three steps. See BNA at 117. First, the employee submits the written grievance to her immediate supervisor, who must respond within a certain timeframe. If the employee is dissatisfied with the outcome of Step 1, she may appeal the grievance to the Chairman within 10 working days. If, after Step 2, the employee is still aggrieved, she has 21 days to appeal the decision to arbitration. Id.

Huang did begin this process by filing a Step 1 grievance on September 17, 2015. Doczkat issued a denial decision on October 19, 2015, but Huang never appealed that decision to the Chairman. She does not provide any explanation and thus has no defense for her inactivity. As Plaintiff never completed the administrative process, the Court finds that she did not exhaust her claim, and it must be dismissed.

B. Merits

Even if the Court were to treat Plaintiff's step-increase claim as exhausted, it nevertheless fails on the merits. For Huang, Doczkat's September 11, 2014, comments on her wireless-microphone-study project are evidence of his discrimination and the seed from which the pay-

12

increase denial sprouted. See Pl. Opp. at 4. Defendant counters that Plaintiff's fail rating was solely attributable to her poor work performance.

Title VII prohibits an employer from both 1) directly discriminating against an employee because of her race, sex, color, religion, or national origin and 2) retaliating against an employee for opposing discriminatory employment practices. The ADEA forbids employers from discriminating against employees over 40. See 29 U.S.C. § 623. As both sides agree that there is no direct evidence of discrimination or retaliation, the Court moves directly to the three-part burden-shifting framework set forth in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802-05 (1973). Under this framework, the plaintiff carries the initial burden of establishing a *prima facie* case of discrimination. "If the plaintiff meets this burden, '[t]he burden then must shift to the employer to articulate some legitimate, nondiscriminatory reason' for its action. If the employer succeeds, then the plaintiff must 'be afforded a fair opportunity to show that [the employer's] stated reason . . . was in fact pretext' for unlawful discrimination. Chappell-Johnson v. Powell, 440 F.3d 484, 487 (D.C. Cir. 2006) (quoting McDonnell Douglas, 411 U.S. at 802, 804). When, however, "an employee has suffered an adverse employment action and an employer has asserted a legitimate, non-discriminatory reason for the decision, the district court need not-<u>and should not</u>-decide whether the plaintiff actually made out a prima facie case under McDonnell Douglas." Brady v. Office of Sergeant at Arms, 520 F.3d 490, 494 (D.C. Cir. 2008). The Court's sole task in such cases is to "resolve one central question: Has the employee produced sufficient evidence for a reasonable jury to find that the employer's asserted non-discriminatory reason was not the actual reason and that the employer intentionally discriminated against the employee on the basis of race, color, religion, sex, or national origin?" Id. The plaintiff must "present[] enough evidence to allow a reasonable trier of fact to conclude that the

13

employer's proffered explanation is unworthy of credence." Desmond v. Mukasey, 530 F.3d 944, 962 (D.C. Cir. 2008) (citation and internal quotation marks omitted). If, even crediting the employee's evidence as true, no reasonable jury could find that the employer's legitimate, non-discriminatory reason for the decision was pretextual, the Court must grant the Defendant summary judgment. See Guajacq v. EDF, Inc., 601 F.3d 565, 570 (D.C. Cir. 2010).

The Agency's denial of Huang's within-grade increase is undisputedly an adverse action, as she suffered a direct diminution in pay. See Douglas v. Donovan, 559 F.3d 549, 553 (D.C. Cir. 2009). Defendant, however, proffers a simple business reason for the denial: Plaintiff's work was unacceptable for an engineer of her level. To support this contention, the Agency provided her infamous wireless-microphone-study report draft (complete with Doczkat's 83 comments); sworn statements from Weller, Johnston, and Doczkat attesting to Huang's poor performance; a GS-15 position description that details the expectations for a senior engineer; and various formal and informal performance reviews from 2014 and 2015 where Doczkat and Johnston express to Huang their perceived deficiencies in her work. See Def. MSJ, Exhs. B-H; ROI 40-70, 124-244. In response, Plaintiff marshals evidence of her own in an attempt to show pretext. She points out, for example, that the majority of Defendant's evidence comes from Doczkat and Johnston — the very individuals she claims are responsible for the discrimination. Huang urges the Court instead to look at her background and history with the FCC, and she provides evidence of her two master's degrees, achievement and performance awards, personal recommendations, and all of her previous performance evaluations from the Commission. See Pl. MSJ, Exhs. A-E. Huang correctly points out that she never had a fail rating until Doczkat became her supervisor, and, while Weller did provide extensive feedback on her report, the record does not contain any suggestion that he ever told Huang she was underperforming.

14

At the summary-judgment stage, the Court's role is not to weigh the evidence or make credibility determinations but to draw reasonable inferences in the light most favorable to the non-moving party. See Robinson v. Pezzat, 818 F.3d 1, 9 (D.C. Cir. 2016). That is, if the parties present "directly contradictory evidence," the plaintiff gets the benefit of the doubt. Tolan v. Cotton, 134 S. Ct. 1861, 1867 (2014); see Robinson, 818 F.3d at 9. Particularly given Huang's background and more than 20-year satisfactory run at the Agency, the temporal proximity of her EEO complaint and unsatisfactory performance reviews may give a reader pause. Jones v. Bernake, 557 F.3d 670, 680 (D.C. Cir. 2009) ("[A]n adverse action following closely on the heels of protected activity may in appropriate cases support an inference of retaliation."). The undisputed evidence, however, shows that Plaintiff did not meet the requirements for a within-grade increase.

To be eligible for such a salary bump, Huang must: 1) complete the required waiting period; 2) not have received an equivalent pay increase during the waiting period; and 3) perform "at an acceptable level of competence . . . as documented in the most recent rating of record," ROI at 323 — i.e., a "pass" rating. Defendant concedes that Huang met the first two requirements; the fail rating was the only reason it denied her pay increase. See Def. MSJ, Exh. F (Step 1 Grievance Decision) at 21.

A pass rating indicates that an FCC employee "successfully performed his/her duties and responsibilities in furthering the mission and goals of the Federal Communications Commission." ROI at 82 (Employee Review Form). As a GS-15 TAB engineer, Huang's responsibilities included originally and thoughtfully engaging with complex, high-level electromagnetic-spectrum concepts and data. Engineers in that role serve "as a senior expert consultant, special project director, and advisor to the Branch Chief and to the Division and

15

Deputy Chief" on a host of radio-communication subjects. Id. at 214 (Position Description). They conduct "the most difficult types of technical studies" that require them to "originat[e] and evaluat[e] . . . theoretical and empirical data of electromagnetic wave propagation on all frequencies to provide the [FCC] with basic information and technical recommendations." Id. at 215. GS-15 engineers, accordingly, are expected to work "under the general supervision of the Branch Chief" but exercise "a high degree of originality, initiative, and sound judgment" in fulfilling their role. Id.

No reasonable jury could conclude that Huang satisfied these criteria. She had only two assignments during the applicable review period: the wireless-microphone-study report and a TV Study report. Neither was ever completed. Drafts of the former were not timely submitted, and what Huang deemed as her "final" report is riddled with spelling, formatting, and grammar errors. Even providing her some leeway given that English is not her first language, she does not contest that there were still several errors in the technical analysis. Weller noted "gaps and inconsistencies in the data," and he was unable to reproduce several of Huang's calculations. See Pl. MSJ, Exh. E at 4-5 (Weller letter to Huang). The draft on which Doczkat commented was submitted in September – four months <u>after</u> Weller's original deadline. Huang never further revised the report and, by her own account, ceased doing any work for the Agency, including the TV Study. See Pl. Opp. to Def. SOF, ¶¶ 26-27. She also seemingly acknowledges that her work product was lacking. See Pl. MSJ at 1 ("In [*sic*] the surface, Defendant could possibly show some Plaintiff's unacceptable performed [*sic*]."). Huang, moreover, cannot rely on the timeline to show pretext. While her fail rating (and the preceding poor reviews) "followed closely on the heels," Jones, 557 F.3d at 680, of her protected activity, it also occurred right after Doczkat's

16

September 11 comments on the report, and she has not presented any evidence for a jury to attribute causation to the former as opposed to the latter.

Plaintiff's proffered reasons why she should have received a pass rating notwithstanding her objectively poor work product all founder. First, she quotes language from the Basic Negotiated Agreement between her Union and the FCC, which states that "the supervisor shall assume full responsibility for [his] instructions if they are carried out in the manner prescribed by the supervisor." Pl. MSJ, Exh. E (BNA) at 10. To Huang this means that, once she responded to Weller's comments, he was on the hook for the report. Yet the key point here is that Huang did <u>not</u> carry out her supervisors' instructions "in the manner prescribed." Id. Both Weller and Doczkat noted that her report failed to address certain areas in the assignment and that the Agency could not use it for its intended purpose.

Second, Plaintiff's argument that she tried to work on the report but Doczkat never responded to her does not undercut the legitimacy of Defendant's reason for her step-increase denial. Many of Doczkat's comments related to formatting, grammar, and spelling errors and should not have needed additional discussion or clarification to fix. While Doczkat could have been more responsive to her raising particular issues concerning the technical analysis, a GS-15 engineer like Huang is expected to "exercise[] a high degree of originality, initiative and sound judgment." ROI at 215.

Finally, Huang contends that Doczkat's allegedly discriminatory treatment caused near-fatal increases in her blood pressure that prevented her from working. See Pl. MSJ, ¶ 2. To the extent Plaintiff is attempting to support a Rehabilitation Act claim, that count was dismissed in the prior Opinion. See Huang, 215 F. Supp. 3d at 107-08. If Huang's argument is simply that her hypertension prevented her from satisfactorily completing her work, — and that she was

17

unjustly punished for that — such a claim is not actionable under Title VII.  At the end of the day, Huang produces no evidence showing pretext, leaving the Court with the Agency's legitimate, non-discriminatory reason for not giving her a step-up increase: poor performance.

*     *     *

In addition to her Motion for Summary Judgment, Plaintiff also filed two Motions requesting the Court to relay Defendant's alleged crimes to a prosecuting authority.  See ECF No. 75 (Motion for Honorable Judge to Take Actions Against Crimes of Defendant); ECF No. 76 (Motion for Jury Trial and Opposition of Summary Judgment).  Even if such a Motion were appropriate in this civil matter, the Court is not aware of evidence of criminal conduct here.  Plaintiff also filed a Motion asking the Court to adjudicate her claims under 42 U.S.C. § 1981, see ECF No. 81, but that count was previously dismissed since the statute applies only to private employers.  See Huang, 215 F. Supp. 3d at 111.  The Court therefore denies these Motions.

### IV.  Conclusion

Plaintiff clearly had difficulty adjusting to a new supervisor, and the Court does not doubt that she may have been taken aback by Doczkat's comments and subsequent fail rating after receiving more than 20 years of satisfactory performance reviews.  She, however, concedes that she did not exhaust her within-grade-pay-increase-denial claim before the Agency, and the Court finds no equitable considerations excuse her failure.  Exhaustion aside, no reasonable jury could find that Defendant's reason for denying her within-grade pay increase was pretextual.  The Court will therefore grant Defendant's Motion for Summary Judgment.  A separate Order consistent with this Opinion will be issued this day.

/s/ *James E. Boasberg*
JAMES E. BOASBERG

United States District Judge

Date: September 14, 2017